[No. 32332.   Department Two.   May 26, 1953.]

H. G. HARRIS *et al.*, *Appellants*, v. FIREMAN'S FUND INDEMNITY COMPANY, *Respondent.*[1]

*Rummens, Griffin & Short* and *Paul R. Cressman*, for appellants.

*Eggerman, Rosling & Williams* and *Joseph J. Lanza*, for respondent.

DONWORTH, J.—Plaintiffs, as the insured under an "Owners', Landlords' and Tenants'" public liability policy, brought this action to recover from the insurer. A demurrer was sustained to their supplemental complaint. They declined to plead further, and the trial court dismissed the action.  Plaintiffs have appealed.

The history of this litigation, as it appears from the allegations of the supplemental complaint, is as follows:

Mrs. Pearl Shaw was a patient of appellant Dr. Harris,

[1]Reported in 257 P. (2d) 221.

who at all times mentioned was a practicing osteopathic physician. While administering treatment to Mrs. Shaw, the osteopathic table on which she was lying collapsed. Mrs. Shaw and her husband then commenced an action against appellants in the superior court for King county (hereinafter called the tort action) seeking to recover damages for bodily injuries sustained and medical expenses incurred as a result thereof. The complaint was later amended to increase the amount of damages asked and to include the firm which sold the table as a codefendant.

Appellants tendered the defense of the tort action to respondent, who refused it. Appellants then commenced this action by a suit seeking a declaratory judgment to determine the respective rights and duties under the policy in question. A copy of the insurance policy, together with the malpractice endorsement, was attached to the amended complaint. A demurrer to this complaint was overruled, but before the suit could proceed further the plaintiffs in the tort action recovered a judgment of $5,500 against appellants and their codefendant. Each party defendant paid $2,750 in satisfaction of the judgment.

Appellants then filed the supplemental complaint now before the court, in which they seek to recover from respondent the amount of the judgment recovered against them, together with the expenses incurred in the defense of the tort action. The files and records in the tort action were incorporated by reference as a part of the supplemental complaint. The material portions of the findings of fact entered in the tort action are as follows:

"II

"That the defendants Dr. H. G. Harris and E. Rennie Harris were at all times herein mentioned and now are husband and wife and residents of Seattle, King County, State of Washington, and that defendant Dr. H. G. Harris was at all times herein mentioned and now is a practicing osteopathic physician in the City of Seattle, State of Washington, and that the acts complained of by plaintiffs were done by said defendant for the benefit of himself, his said wife and the marital community they compose."

"IV

"That on or about the 6th day of September, 1950, the plaintiff Pearl Shaw visited the offices of the defendant Doctor at 4108 E. Madison Street in Seattle, for the purpose of receiving an osteopathic treatment; that the defendant Doctor instructed said plaintiff to lie on her back on a certain osteopathic treatment table in his office purchased by him from the defendant, Shaw Supply Co. Inc., preparatory to his administering an osteopathic treatment to said plaintiff intended to make certain adjustments to her back; that the treatment prescribed required said plaintiff to clasp her hands behind her neck with her elbows in front of her as the defendant Doctor, standing on the floor at said plaintiff's right side, placed his right hand under her back and with his left arm applied downward pressure in the region of her elbows; that said Doctor had applied said treatment on previous occasions, that the same was a standard treatment administered by the osteopathic profession in Seattle for the condition of which plaintiff then complained; that said treatment was not negligently or improperly administered by said Doctor."

"V

"That the carelessness and negligence of the defendant Doctor and of the defendant Shaw Supply Co. Inc., were the proximate cause of the injuries to plaintiff Pearl Shaw hereinafter described and consisted of the following acts and omissions to-wit:

"1. That the defendant Shaw Supply Co. Inc., sold said table to the defendant Doctor prior to the above described incidents as second hand merchandise, with the knowledge that at the time of said sale said table was defective in that it did not have an adequate safety catch to prevent it from collapsing to the floor.

"2. That prior to the above described incidents the defendant Doctor knew of said defective safety catch in said table or by the exercise of reasonable care could have discovered the defect by an ordinary and reasonable inspection thereof.

"3. That when the defendant Shaw Supply Co. Inc. sold said table to the defendant Doctor it knew that patients would be placed on said table for treatment and that a defective safety catch would permit the sudden collapse of the table under downward pressure and would be likely to cause injury to such patients.

"4. That the defendant Doctor failed to provide a safe

place for the plaintiff Pearl Shaw, who was then and there a business guest and invitee of said defendant."

The sole question presented is whether the allegations of the supplemental complaint are sufficient to state a cause of action against respondent insurer under the policy and the endorsement.

In the policy of insurance referred to in the supplemental complaint, respondent agreed to insure appellants "subject to the limits of liability, exclusions, conditions and other terms of this policy" as follows:

"I Coverage A—Bodily Injury Liability. To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the hazards hereinafter defined. . . .

"Definition of Hazards. Division 1. Premises—Operations. The ownership, maintenance or use, for the purposes stated in the declarations, of the premises, and all operations which are necessary or incidental thereto. . . ."

Under the heading "Declarations" the following statements were made:

Location of insured premises: 4108 East Madison, Seattle, Washington
How occupied: Physicians' offices
Part occupied by insured: Insured's office
Portion insured: Insured's occupancy only.

Attached to the policy was a "Malpractice Endorsement" which read:

"It is agreed that such insurance as is afforded by this policy shall not apply as respects bodily injuries, sickness, disease or death, or injury to or destruction of property attributable thereto, arising out of or resulting from

"(a) any error, negligence or mistake made by the insured or any employee of the insured in preparing, handling, dispensing, selling, compounding or delivering any medicines, drugs, chemicals, anaesthetics, mixtures, prescriptions, pharmaceutical preparations or compounds;

"(b) any malpractice, error, negligence or mistake com-

mitted by any person in the performance or omission of professional services."

Appellants argue that this policy and the endorsement, when read together in the light most favorable to appellants, insured them against all accidents occurring on the premises except as to professional error, negligence, or mistake amounting to malpractice. They cite *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148, for a definition of the latter term.

To support their argument that no "malpractice" as thus defined was involved in the case, appellants call attention to finding of fact No. IV entered in the tort action and incorporated in the supplemental complaint. The pertinent portion reads:

" . . . that said Doctor had applied said treatment on previous occasions, that the same was a standard treatment administered by the osteopathic profession in Seattle for the condition of which plaintiff then complained; that said treatment was not negligently or improperly administered by said Doctor."

We are not concerned with the propriety of the type of treatment administered by appellant husband as measured by the standard in the community. The question to be determined is whether the use of the defective osteopathic table under the circumstances constituted "malpractice, error, negligence or mistake committed . . . in the performance or omission of professional services." That the meaning of this endorsement covers more than if the word malpractice alone were used, as contended by appellant, is shown by our holding in *Sutherland v. Fidelity & Cas. Co.*, 103 Wash. 583, 175 Pac. 187. We there said:

"The words *malpractice, error* and *mistake*, as used in this indemnity policy, do not mean necessarily the same thing. If they were so intended, it was an idle thing to insert more than the word *malpractice*. A physician may err or make a mistake without being guilty of malpractice. This policy covers malpractice. It covers error, and it covers mistake in the practice of appellant's profession; and if liability flows from either, and he is required to pay damages on that account, we think it is plain that the policy

here undertook to insure against such mistake or such error, as well as against malpractice. The words 'liability imposed by law' clearly refer to a judgment recovered on account of malpractice, error or mistake, and do not limit the policy to cases where there was simply malpractice, where the physician is required to use care, diligence and such skill as is ordinarily possessed by the average members of the profession in good standing."

In view of this holding, it cannot be said that the language of the endorsement is ambiguous.

The findings of fact in the tort action, which are part of the allegations of the supplemental complaint, show very plainly that the table being used by the osteopathic physician at the time it collapsed and injured the patient was no ordinary piece of office furniture. It was especially designed to enable an osteopathic physician to give his patients the type of treatment which he was licensed to give. It was as much a part of an osteopath's professional equipment as an operating table is part of a surgeon's professional equipment.

The findings further state the table was sold to appellant husband as secondhand merchandise, and that he knew before he placed Mrs. Shaw on the table for osteopathic manipulation that its safety catch was defective or by the exercise of reasonable care could have discovered such defect. It is stated therein that this negligence was the proximate cause of the collapse of the table which caused Mrs. Shaw's injuries. The judgment against appellants was rendered on the basis of these findings.

These allegations, in our opinion, are sufficient to show that Mrs. Shaw's injuries arose out of and resulted from malpractice, error, negligence, or mistake committed by appellant husband in the performance of his professional services as an osteopathic physician, and thus the accident comes within the terms of the endorsement attached to the policy.

In support of their contention that the endorsement cannot be held to exclude liability for Mrs. Shaw's injuries under the allegations of the supplemental complaint, ap-

pellants cite three decisions: *Norways Sanatorium v. Hartford Acc. & Indemnity Co.*, 112 Ind. App. 241, 41 N. E. (2d) 823, 44 N. E. (2d) 192; *Kime v. Aetna Cas. & Surety Co.*, 66 Ohio App. 277, 33 N. E. (2d) 1008, and *Maryland Cas. Co. v. Crazy Water Co.*, 160 S. W. (2d) (Tex. Civ. App.) 102.

We have examined these cases and do not think that they are applicable to the facts alleged in the supplemental complaint. In the first case cited, a mental patient in a sanatorium jumped or fell out a window. He was not receiving any professional treatment at the time. The court held that the insurance company was liable because the accident was not caused by an omission of professional service by any physician, surgeon, or nurse, and consequently the exemption clause of the policy did not apply.

The second case involved a policy of insurance which was limited to malpractice, error, or mistake in the practice of optometry. The insured optometrist attempted to remove a foreign particle from a patient's eye allegedly by means of a surgical instrument and damaged the eye in the process. It was held that this activity did not come within the proper functions of a licensed optometrist and, therefore, was not covered by the policy.

The last case referred to above was concerned with the question whether a menial employee of a hotel, who was employed to assist patrons in taking certain medical baths, was rendering professional services within the meaning of an endorsement attached to the hotel's public liability policy. The court held that the tubber, who was being employed at $1.60 per day, was not engaged in rendering professional services, and that the insurance company was liable to the hotel.

The decision which, although it involved a policy covering claims for injuries arising out of professional services, appears to us to be in point in the instant case is *American Policyholders Ins. Co. v. Michota*, 156 Ohio St. 578, 103 N. E. (2d) 817, in which the insurance company sought a declaratory judgment as to its obligation to defend a certain action brought against its insured, a chiropodist, by one of his patients. The policy under consideration was designated

as a "Professional Liability Policy" and required the insurer to defend each suit brought against the insured "to enforce the liability imposed by law for the payment of damages as respects an injury arising out of the practice of the insured's profession."

The factual situation was that a patient was told by the chiropodist to sit in a certain treatment chair, which rotated in a manner similar to a barber's chair. As the patron was getting into the chair, it rotated, and she lost her balance and fell to the floor, whereby she sustained certain injuries. In her suit against the chiropodist, she alleged that he was negligent in failing to lock the chair, in failing to warn her of its dangerous condition, and in failing to maintain the chair in a safe condition for her use as a patient.

In holding that the insurance company was obligated by its policy to defend the suit on behalf of the chiropodist, the supreme court of Ohio said:

"This court is of the opinion that the Court of Appeals was correct in its conclusion and judgments. The policy is entitled 'Professional Liability Policy' and nowhere in the quoted language relied on is the liability of the insurer restricted to 'malpractice.' Nor by the wording of the policy is liability thereunder confined to a failure on the part of the insured to exercise that standard of professional skill in the treatment of patients prescribed by law.

"Prior to November 9, 1949, Mrs. Hirssig had been a patient of Michota. When on that date she entered the doctor's office and in a treatment room thereof began to follow his precise instructions in preparing herself for his professional ministrations, the relationship of patient and doctor was clearly established. Her claimed injuries, according to the allegations of her petition, were due to the negligence of the doctor in failing to maintain apparatus employed by him in his practice of chiropody in a safe condition for her use as a patient.

"The injury described was one 'arising out of the practice of the insured's profession' and also constituted 'an injury resulting from professional services rendered or which should have been rendered.' Maintaining the treatment chair in a proper and safe condition for the accommodation of patients was a service or duty directly connected

with the practice by Michota of his profession as a chiropodist, chiropody being a limited branch of medicine or surgery. See Section 1274-1, General Code.

"In accordance with the judgments of the Court of Appeals, the insurer, under the policy and with any doubt or ambiguity in the meaning or scope of the language used resolved in insured's favor, is obliged to defend the action of Mrs. Hirssig against Michota, and, in the event of a verdict and final judgment against him upon evidence supporting substantially the averments of Mrs. Hirssig's petition, the insurer is liable to pay on the doctor's behalf, in satisfaction of the judgment, such sum as may be within the limits of the policy."

Since the negligence of the chiropodist was held to have come within the provisions of the professional liability policy, it would seem to follow that in the present case the similar negligence of appellant husband (an osteopathic physician) must be held to come within the provisions of the endorsement attached to appellant's policy.

Two other cases involving the meaning of professional services in policies written with respect to beauty salons are: *Ruggieri v. New Amsterdam Cas. Co.*, 276 App. Div. 1031, 95 N. Y. S. (2d) 832; *Knorr v. Commercial Cas. Ins. Co.*, 171 Pa. Super. Ct. 488, 90 A. (2d) 387.

In the *Knorr* case, the court commented on the form of the policy as follows:

"Defendant had issued to the plaintiff an 'Owners', Landlords' and Tenants'' insurance policy of the type issued to cover the ordinary risks of dwellings and commercial buildings. An endorsement on the policy specifically provided that it did '. . . not apply under Division 1 of the Definition of Hazards, to the rendering of any professional services . . . by any person, including any physician, surgeon, dentist, optician, nurse, barber, manicurist, masseur, chiropodist or other attendants.' The evidence establishes that defendant's agent at that time even indicated to plaintiff two examples of the type of accident excluded under this policy, e.g., a manicurist cutting the finger of a customer or a customer being burned by a permanent wave machine. The injury in this case occurred when a customer who was seated beneath a mechanical hair-dryer was struck on the head when this instrument unexplainedly fell for-

ward and downward. The pivotal issue for our determination, therefore, is whether the term 'professional services' as set forth in the insuring contract and endorsement excludes the drying of a customer's hair in a beauty parlor by means of a mechanical hair-dryer.

"In construing the policy of insurance, it is the duty of the court to attempt to ascertain what was probably in the contemplation of the parties when the contract was written. *Ferry v. Protective Indemnity Co.*, 155 Pa. Superior Ct. 266, 38 A. 2d 493. The evidence establishes that plaintiff was informed that the contract specifically excluded injuries arising from the 'rendering of any professional services', and that the phrase 'professional services' was explained by defendant's agent by giving two examples. This much the appellant concedes, but argues that 'By no stretch of the imagination can it be said that the patron . . . was injured as a result of professional services'. There is no merit to this contention. Since this policy was issued specifically to cover a beauty parlor, it is clear that the term 'professional services' refers to the technical work performed by beauticians, hair-dressers, etc. The patron contracted to have her hair rinsed and an integral operation of that service was to dry the hair by means of a mechanical hair dryer. It was indeed a part of the overall service of rinsing hair. Moreover, in the statute requiring the licensing of beauty parlors and beauticians, the type of work covered by the Act is defined at length and includes any kind of work done to the hair 'by the use of mechanical or electrical apparatus or appliances. . . .'. Act of May 3, 1933, P. L. 242, as amended, 63 PS § 507. Certainly it was within the contemplation of the parties to exclude accidents arising from work being performed by plaintiff's employees as professional beauty culturists. In addition to the plain wording of the exclusion and the clarifications given plaintiff by defendant's agent, the title of the policy 'Owners', Landlords' and Tenants'' liability obviously disclosed that the policy was intended to cover the normal type of accidents occurring on real estate and not the type injury as was sustained which germinated the present litigation. Furthermore, the premium rate of the insurance was calculated upon the area of the property, the footage of the public sidewalks and ordinary hazards common to such properties."

Much of this language is applicable to the case at bar. Here respondent issued to appellants an "owners', land-

lords' and tenants' " insurance policy of the type issued to cover the ordinary risks incident to the occupancy of a commercial building. Attached thereto was an endorsement excluding claims arising out of any malpractice, error, negligence, or mistake committed in the performance or omission of professional services. Since this policy was issued with respect to the office of an osteopathic physician, it is clear that the term professional services refers to the ministrations of such a physician as defined in RCW 18.57-.010 *et seq.* [*cf.* Rem. Rev. Stat., § 10056 *et seq.*].

Furthermore, the amount of the premium ($47.91 for a three-year period) was calculated on the area of the insured premises (800 square feet at a certain rate per square foot), which would seem to be a peculiar manner of measuring the cost of a risk which included the type of claim involved in this case.

Since the judgment against appellants which Mrs. Shaw and her husband obtained in the tort action arose out of and resulted from malpractice, error, negligence, or mistake committed by appellant husband in the performance of professional services, it must be held to come within the exclusionary provisions of the endorsement attached to the policy.

It follows that the action of the trial court in sustaining respondent's demurrer to the supplemental complaint was correct, and its judgment dismissing this suit is hereby affirmed.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.